## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**TONI WALLACE,**
      **PLAINTIFF**

vs

**COMMISSIONER OF**
**SOCIAL SECURITY,**
      **DEFENDANT**

**CASE NO. 1:09-cv-00382**
**(BECKWITH, Sr. J.)**
**(HOGAN, M. J.)**

### REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc.11), the Commissioner's Memorandum in Opposition (Doc. 12), and plaintiff's Reply Memorandum. (Doc. 13).

### PROCEDURAL BACKGROUND

Plaintiff, Toni Wallace, was born on March 16, 1959, and was 49 years old at the time of the administrative law judge's ("ALJ") decision. Plaintiff earned a General Equivalency Diploma (GED) in 1995 and reported attending special education classes while in school. (Tr. 121). Plaintiff earned certification as a nursing assistant from Cincinnati State. (Tr. 26 and 121). Plaintiff has past work experience as a nurse's aide. Plaintiff filed her applications for SSI and DIB on April 10, 2006, alleging disability due to a neck and back injury. (Tr. 115). Plaintiff's applications were denied initially and upon reconsideration. Plaintiff requested and was granted a *de novo* hearing before an ALJ. On October 9, 2008, plaintiff, who was represented by counsel, appeared and testified at a hearing before ALJ Donald A. Becher.

On November 7, 2008, the ALJ issued a decision denying Plaintiff's DIB and SSI

applications. (Tr. 9-19). The ALJ determined that Plaintiff was insured through December 31,

2008. (Tr. 11). The ALJ further determined that Plaintiff has severe impairments consisting of

degenerative disc disease in the cervical spine (s/p anterior cervical discectomy and fusion) and

thoracic spine, depressive disorder, and borderline intellectual functioning, but that such

impairments do not alone or in combination with any other impairment meet or equal the level of

severity described in the Listing of Impairments. (Tr. 11, 13). According to the ALJ, plaintiff

retains the following residual functional capacity (RFC):

> Physically, she can lift and carry up to 20 pounds occasionally and 10 pounds
> frequently: in an eight-hour workday, she can stand and walk a total of
> approximately six hours and can sit a total of approximately six hours [with
> normal breaks]; she can frequently climb ramps and stairs, but can never climb
> ladders, ropes or scaffolds and can only occasionally crawl. She should avoid
> overhead reaching on the left. Mentally, the claimant can understand, remember
> and carry out simple and moderately complex tasks in a static work setting where
> changes are few and expectations are clearly defined.

(Tr. 14) (citation to record omitted). The ALJ determined that plaintiff is unable to perform her

past relevant work. However, the ALJ found that given plaintiff's age, education, work

experience, and residual functional capacity, plaintiff retains the ability to perform work which

exists int eh national economy in significant numbers. Consequently, the ALJ concluded that

plaintiff is not disabled under the Act.

Plaintiff requested review by the Appeals Council. The Appeals Council denied

plaintiff's request for review, making the decision of the ALJ the final administrative decision

of the Commissioner. (Tr. 1-4).

2

**MEDICAL RECORD**

Plaintiff was injured at work on June 10, 2003, while trying to catch a patient who was falling off a bed at a nursing home. (Tr. 186). Plaintiff was originally diagnosed with a cervical and thoracic strain. (Tr. 184).

A Bureau of Workers' Compensation ("BWC") physician reported on July 8, 2003, that plaintiff could return to work with carrying and pushing/pulling limited to 1-5 lbs. (Tr. 181). On July 25, and August 5, 2003, physicians for BWC indicated that plaintiff could return to work with carrying and pushing/pulling limited to 6-25 lbs. and an additional limitation of no double shifts. (Tr. 179-80).

An MRI of the cervical spine taken on July 30, 2003, revealed mild cervical disc herniation at C5-C6 and C6-C7. (Tr. 279).

Plaintiff saw Carl Shapiro, D.O. at the Mayfield Spine Institute, from September 3, 2003, to December 10, 2003. (Tr. 193-98). Initially, plaintiff complained of neck and back pain, pain between the shoulder blades that went up into her neck and down into the thoracolumbar junction, numbness and tingling in her left arm with some intermittent weakness and occasional dysesthesia in her right arm. (Tr. 196). Examination was remarkable for some 4+ grade weakness in the wrist extensors of the left hand. (Tr. 197). Dr. Shapiro ordered an EMG of plaintiff's left arm to ensure no nerve damage had occurred. *Id.* The EMG taken on September 30, 2003, was normal. (Tr. 198).

3

Plaintiff attended 9 physical therapy sessions in October 2003. (Tr. 185-92). On October 6, 2003, it was noted that plaintiff had difficulty sitting. (Tr. 188). On October 20, 2003, plaintiff reported that she went to bingo on Saturday night and had experienced more pain as a result of sitting and looking down for 2-3 hours. (Tr. 191). The discharge summary reported that plaintiff was still guarded with significant pain. (Tr. 185).

Plaintiff was referred to A. Lee Greiner, M.D., a neurosurgeon, at the Mayfield Spine Institute in December 2003. Dr. Greiner noted that other treatments had been unsuccessful to date and he suggested a two-level anterior cervical disc fusion, allograft and plating system. (Tr. 241-42). The surgery was delayed because plaintiff had a low hemoglobin count. (Tr. 234). On July 12, 2004, Dr. Greiner reported that plaintiff was found to have anemia due to a benign tumor in her uterus, which was under control and she had a high level of TSH. (Tr. 239). On January 27, 2005, Dr. Greiner indicated they had been unable to schedule the surgery because of plaintiff's low hemoglobin count and her continued smoking. Dr. Greiner indicated that plaintiff was only smoking an occasional cigarette at that time. He indicated he was not comfortable with proceeding with the cervical disc surgery at that time in light of her current symptoms and her low blood counts. (Tr. 234-35). On February 21, 2005, Dr. Greiner reviewed plaintiff's new blood counts and stated that, after a year of waiting, they would proceed with the cervical fusion. (Tr. 233).

On May 13, 2005, plaintiff underwent a C5-C6 and C6-C7 anterior cervical decompression and anterior allograft arthrodesis with C5, C6, and C7 anterior plating system. (Tr. 223-24). Post-operatively, plaintiff was restricted to lifting no more than 10 pounds and told to begin a walking program. (Tr. 219).

4

On June 13, 2005, Scott Basham, NP, at the Mayfield Spine Institute, reported that plaintiff's cervical spine X-rays showed adequate placement of the screws and interbody fusion material with minimal pre-vertebral soft tissue swelling. Plaintiff reported that her pre-operative arm pain had improved. She complained of significant mid scapular and posterior neck and shoulder pain for which she was taking Vicodin and Flexeril. Examination revealed 5/5 motor strength. Her sensation was intact. She had bilateral Hoffmann's and 2+ symmetric deep tendon reflexes. Her incision line was well healed and unremarkable. (Tr. 217-18). On July 18, 2005, plaintiff complained of pain in her bilateral shoulders down the middle of her back to her lumbar region. On physical examination, Nurse Practitioner Basham reported that plaintiff walked with a slightly humped forward but steady gait. He noted Hoffman's sign was positive bilaterally. He stated plaintiff had palpably tight muscles posteriorly along her entire spinal axis. (Tr. 216). On July 25, 2005, Dr. Greiner stated that plaintiff continued to have significant neck and interscapular bilateral trapezius pain, which he indicated was fairly typical of post-operative anterior cervical surgery, although plaintiff's pain was of a higher degree. Dr. Greiner stated that plaintiff had been relieved of her pre-operative symptoms. (Tr. 214).

Plaintiff attended physical therapy from August 8, 2005 to September 23, 2005. Throughout her sessions, plaintiff reported her pain levels were between 6-9/10. The last progress note states that plaintiff is making good progress with tolerance and endurance. (Tr. 199-205).

An MRI of the cervical spine taken on September 24, 2005, showed mild disc bulging at T3-4 without neural compression, relative decreased T1 signal throughout the visualized

5

vertebral bodies, and prominent adenoid tissue with inhomogeneous signal that may be related to a thornwald cyst. (Tr. 243-44).

On October 18, 2005, plaintiff was seen by seeing George D.J. Griffin III, M.D., a pain management specialist, in consultation for her BWC injury. Plaintiff complained that since her surgery, she has had increased pain in the upper thoracic spine with radiation into the arms with any flexion. She described the pain in the C7 nerve root distribution of the arms and hands as well as to a certain extent C6. Plaintiff has increased burning pain over the upper thoracic region and has problems with aching pain there as well. She has noted that the fusion did alter her posture somewhat as it has completely removed the cervical lordosis in the area of the fusion. Examination revealed that plaintiff had restricted range of motion of the cervical spine and tenderness to palpation over the paraspinous muscle. Dr. Griffin diagnosed plaintiff with a neck sprain, sprain to the thoracic region and displacement of cervical intervertebral disc without myelopathy. (Tr. 270-71).

On December 29, 2005, Dr. Greiner reported that plaintiff remained unimproved with interscapular pain and some intermittent pain into her left arm. Dr. Greiner also reported that post operative imaging showed good healing of her fusion and no neural compression. There is some reversal of her cervical lordosis. Dr. Greiner further reported two degenerated discs in plaintiff's thoracic region but stated this "would not explain all of her symptoms." Dr. Greiner referenced plaintiff's examination by Dr. Pearson[1], who saw plaintiff in consultation at the request of her employer and found plaintiff to have a full range of motion in her cervical spine and normal neurological results. Dr. Greiner stated that his findings confirmed the findings of

---

[1] Dr. Pearson's examination records were not included in the administrative record.

6

Dr. Pearson and informed plaintiff he did not have "any further recommendations or ideas about how to better manage her pain." (Tr. 207-08).

In February 2006, Dr. Griffin reported that plaintiff's range of motion of the cervical spine was decreased by 20%. (Tr. 269). Dr. Griffin also reported that plaintiff had positive Neer sign in her left side and muscle tightness in her trapezius and paraspinous muscle. (Tr. 268). On March 10, 2006, Dr. Griffin reported that plaintiff had tenderness over the posterior superior trigger point and posterior interior trigger point. (Tr. 267).

On March 22, 2006, examining orthopedic surgeon, Steven Goldfarb, M.D. reported that plaintiff's range of motion of the cervical spine was limited secondary to pain. Plaintiff had mild to moderate paraspinal muscle tenderness specifically to her parascapular region. Dr. Goldfarb also reported that she had 4/5 strength diffusely in the upper extremities. He noted Spurling maneuver was positive, reproducing radicular pain down both arms with extension of the cervical spine. Dr. Goldfarb reported that the MRI of the cervical spine dated September 24, 2005, did not mention the status of the fusion. Dr. Goldfarb stated that her symptoms were not consistent with radiculopathy but were consistent with continued neck pain. Dr. Goldfarb opined that her ongoing symptoms were most likely chronic in nature and were unlikely to improve with time. Dr. Goldfarb indicated that plaintiff was in severe pain and had significant decreased range of motion, and as a result he felt she was essentially totally disabled at that time. Dr. Goldfarb suggested that a repeat MRI of the cervical spine to ensure a solid fusion. If the MRI represented a solid fusion, Dr. Goldfarb indicated chronic pain management would be appropriate. Dr. Goldfarb concluded that plaintiff would never be able to return to gainful employment and would be permanently disabled secondary to her injury. (Tr. 246-48).

7

In a "Report of Work Ability" Dr. Goldfarb reported that plaintiff could carry no weight and could not: bend, twist/turn, push/pull, squat/kneel, stand/walk, sit, lift above her shoulders or each below her knees. (Tr. 249).

Throughout 2006, Dr. Griffin continued to treat plaintiff with a combination of pain medications and advised her to exercise regularly. (Tr. 255-66). In April 2006, Dr. Griffin documented radicular pain in her C6 and C7 nerve root distribution. (Tr. 266). In May and June 2006, Dr. Griffin noted muscle tightness in her trapezius and radicular pain in the left C6 nerve distribution. (Tr. 263, 265). On June 30, 2006, Dr. Griffin reported that plaintiff had a positive Neer sign on the left side and muscle tightness and radicular pain in the left C6 nerve distribution. (Tr. 261). On July 20, 2006, plaintiff complained of daily headaches due to neck and shoulder pain. Dr. Griffin reported that plaintiff had a positive Neer sign and Hawkins sign in her neck and shoulder, muscle tightness in her trapezius and paraspinous muscle. Dr. Griffin also noted anterior and lateral shoulder tenderness and tenderness in the posterior superior trigger point. (Tr. 259). On August 18, 2006, Dr. Griffin reported that plaintiff had tenderness in her lateral arm, muscle tightness in her trapezius and paraspinous muscle, radicular pain in the C6 and C7 nerve root distributions. (Tr. 257). On September 22, 2006, Dr. Griffin reported C5 distal tenderness into the thoracic spine and paraspinous muscle tenderness bilaterally in the neck. (Tr. 255). On October 20, 2006, Dr. Griffin reported that plaintiff had paresthesia and numbness in the left C6 to her fingers. He noted muscle tightness in her left trapezius and paraspinous muscle. He noted tenderness over the posterior superior trigger point, supraspinatus, posterior left neck, and tenderness in the left trapezius. (Tr. 253).

8

An MRI of the cervical spine dated October 31, 2006, was mildly limited secondary to patient motion. The MRI showed mild discogenic changes at C6-C7 producing partial effacement of the subarachnoid space and mild left foraminal narrowing; and, decreased T1 signal throughout the vertebrae that was consistent with a cellular marrow seen with anemia or other marrow replacing entities. (Tr. 275-76).

Plaintiff received three epidural steroid injections from December 2006, through February 2007. (Tr. 384-89). After the third injection, another injection was not ordered because plaintiff had only experienced minimal benefits. (Tr. 384).

Plaintiff continued to treat with Dr. Griffin from December 2006, through August 2008. Dr. Griffin generally reported that plaintiff had muscle tightness in the left trapezius, tenderness over the posterior superior trigger point and posterior neck, tenderness over the AC joint, the anterior gleno-humeral joint, the posterior superior trigger point and the posterior neck on the left. Dr. Griffin also reported that range of motion was decreased by 30-40% due to pain and tightness. He reported she had radicular pain in the C6 nerve root distribution. Dr. Griffin generally noted that plaintiff's pain was well-controlled by her medication and she suffered no side effects. He consistently told plaintiff that the medication would not impair her ability to drive. (Tr. 343-83, 392-95).

On February 15, 2007, Nick Albert, M.D. a state agency reviewing physician, reported that plaintiff could perform light work, but was restricted to no climbing ladders, ropes, or scaffolds; occasional crawling; and limited overhead reaching on the left side. Dr. Albert opined that the severity and duration of plaintiff's symptoms were disproportionate to the expected severity and duration based on her medically determinable impairments. (Tr. 310-17).

9

Plaintiff was evaluated by Rafael Ramirez, M.D., a neurosurgeon, on behalf of the BWC on August 24, 2007. Dr. Ramirez reported evidence of bilateral paravertebral muscle spasm with flattening of the normal lordotic curvature and limitation of movement. Based on manual muscle testing, Dr. Ramirez found normal strength in the upper extremities. Sensory examination showed hypesthesia involving the left hand and forearm without dermatome distribution. Examination of the thoracic spine revealed some degree of paravertebral muscle spasm with diminished limitation of motion, and tenderness to palpitation. Dr. Ramirez also noted that plaintiff appeared to be in a significant amount of pain. Dr. Ramirez could detect no definite neurological defect to account for plaintiff's left arm symptoms. Dr. Ramirez opined that plaintiff had 29% whole person impairment for the allowed conditions in the workers' compensation claim. (Tr. 390-91).

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the October 9, 2008, administrative hearing that her injury caused pain and pressure in her back, neck, and left arm. (Tr. 31). She believed that the cervical fusion caused her condition to worsen and stated, "I wish I didn't have the surgery." *Id.* Plaintiff testified that sitting caused pressure on her back and neck, so she had to change positions and could not stay sitting. (Tr. 32).

Because of her pain, she can no longer play bingo, go to social gatherings, walk or do anything physical. It all makes her pain worse. (Tr. 33-34). Plaintiff testified she could walk past four trailers in her trailer park before she began to feel pain. (Tr. 35-36). Plaintiff testified that she has trouble lifting and carrying things like groceries because it puts strain on her

10

shoulders. (Tr. 36). Plaintiff felt she could lift up to 10 pounds. *Id.* She would be hurting later, but she could do it. (Tr. 37). She usually does not bend, she will just scoot. *Id.* She does not kneel, so she does not know if she could kneel or not. *Id.* She has a driver's license, but she does not drive anymore because of her medication. (Tr. 36, 43). Plaintiff testified that she had difficulty climbing stairs because it hurt her legs and back and she had to stop and catch her breath. (Tr. 38).

Plaintiff testified that she was depressed but her medication helped some days. (Tr. 38). Plaintiff testified that her medication made her tired and slows down her flexibility. (Tr. 41). She also testified that she made her own breakfast and lunch but her children brought her dinner. (Tr. 41-42). Plaintiff testified that her daughter, daughter-in-law and husband performed the household chores. (Tr. 42-43). She will leave her trailer to see her children about once every six months. (Tr. 45). She does not go to church or visit friends. (Tr. 46). Plaintiff testified that she could go shopping and went twice per month with either her husband, daughters or daughter-in-law. (Tr. 47).

### THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ's hypothetical question to the vocational expert (VE) assumed an individual with Plaintiff's vocational and educational background who has the residual functional capacity as stated by Dr. Albert. (Tr. 50-51). The VE responded that the Plaintiff could perform the requirements of unskilled light jobs, such as stock/order clerk, with 2,000 jobs locally, 251,000 jobs nationally; cleaner, with 2,000 jobs locally, 243,000 jobs nationally; and food preparation with 1,188 jobs locally, 154,000 jobs nationally. (Tr. 52-53).

11

The ALJ gave the VE a second hypothetical involving an individual who could frequently lift five pounds and occasionally lift 10 pounds; stand 30 minutes at anyone time; walk half a block at any one time; no bending or crouching; only occasionally reaching overhead and only occasionally climbing stairs; and work is limited to simple, routine and repetitive tasks performed in a work environment free of fast-paced production requirements and involving only simple work-related decisions with few if any workplace changes. (Tr. 52). The VE responded that the individual could not perform the above mentioned jobs. *Id.* The VE testified, however, that the second hypothetical is consistent with nearly the full range of sedentary, unskilled work. Examples of such would be inspector or tester, with approximately 100 of those locally and 90,000 nationally. There would be some clerical support occupations, which are primarily collating, shredding, and clerical support, with approximately 800 such jobs locally and 144,000 nationally. (Tr. 53). Based on this testimony, the ALJ determined that plaintiff was not disabled under the Act.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the

12

Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months and plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(1), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not

13

currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education,

14

and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d

321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735

F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the

Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut

plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587

F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771

(6th Cir. 1987).

The Commissioner's Regulations mandate ALJs to provide meaningful explanations for

the weight they give to a particular medical source opinion. As to a treating physician or

psychologist, the Regulations state, "We will always give good reasons in our notice of

determination of decision for the weight we give [the claimant's] treating source's opinion." "

*Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004); (quoting 20 C.F.R.

§404.1527(d)(2)). Similarly, with regard to non-examining state agency physicians or

psychologists, the Regulations mandate, "Unless the treating physician's opinion is given

controlling weight, the administrative law judge <u>must explain</u> in the decision the weight given to

the opinions of a State agency medical or psychological consultant or other program physician or

psychologist, as the administrative law judge must do for any opinions from treating sources,

nontreating sources, and other nonexamining sources who do not work for us." 20 C.F.R.

§404.1527(f)(2)(ii) (emphasis added); *see* 20 C.F.R. §416.927(f)(2)(ii).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must

be supported by some evidence in the record. *Hardaway* v. *Secretary of H.H.S.,* 823 F.2d 922,

927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in

15

all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky* v. *Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley* v. *Secretary of H.H.S.,* 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe* v. *Weinberger,* 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.,* 39F.3d 115, 118 (6th Cir. 1994).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk* v. *Secretary of H.H.S.* 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan* v. *Secretary of H.H.S.,* 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky* v. *Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones* v. *Secretary of H.H.S.,* 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require ... 'objective evidence of the pain itself.'" *Duncan,* 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiffs activities, the effect

16

of plaintiffs medications and other treatments for pain, and the recorded observations of pain by
plaintiffs physicians. *Felisky,* 35 F.3d at 1039·40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the
existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits.
*King v. Heckler,* 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence
conflicts, and there is substantial evidence supporting and opposing a finding of disability, the
Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v.
Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must
articulate, on the record, his evaluation of the evidence and how it relates to the factors listed
above. *Felisky, 35* F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the
Commissioner's credibility finding is entitled to deference and should not be discarded lightly.
*Kirk,* 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly
state his reasons for doing so." *Felisky, 35* F.3d at 1036. The ALJ's articulation of reasons for
crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for
meaningful appellate review." *Hurst* v. *Sec. of H.H.S.,* 753 F.2d 517, 519 (6th Cir, 1985)(citing
*Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

If the Commissioner's decision is not supported by substantial evidence, the Court
must decide whether to reverse and remand the matter for rehearing or to reverse and order
benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's
decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g);
*Melkonyan v. Sullivan,* 111 S. Ct. 2157, 2163 (1991).

17

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

## OPINION

Plaintiff assigns three errors in this case. First, she argues the ALJ failed to give

18

controlling weight to Dr. Goldfarb's RFC.  Plaintiff contends the ALJ credited the opinion of the

state agency reviewing physician, Dr. Albert over the opinion of the examining physician, Dr.

Goldfarb.  Second, Plaintiff argues the ALJ ignored plaintiff's subjective complaints of pain.

Finally, plaintiff contends the ALJ erred by relying on an improper hypothetical to the vocational

expert which does not constitute substantial evidence of the plaintiff's vocational abilities.

Plaintiff argues, in part, that the ALJ failed to accord proper weight to the opinion of

examining physician, Dr. Goldfarb, and instead credited the opinion of state agency reviewing

physician, Dr. Albert.  Plaintiff argues that because the ALJ improperly relied on Dr. Albert's

RFC, he made an RFC finding which is not supported by substantial evidence.  A careful review

of the record reveals that plaintiff's argument is well taken.  The ALJ relied on the opinion of an

nonexamining reviewer to determine plaintiff's RFC.  In so doing, the ALJ gave inadequate

weight to the opinion of Dr. Goldfarb, an examining source.  The ALJ's rejection of Dr.

Goldfarb's RFC findings is based on the ALJ's assertion that Dr. Goldfarb's RFC findings appear

"to have based it primarily on what the claimant told him about her level of pain, even though he

admitted, "She does not really have symptoms consistent with radiculopathy ...." and

acknowledged, based on Dr. Greiner's notes and the MRI, that she apparently had a solid cervical

fusion."  (Tr. 16).  In this case, however, it is the ALJ's reliance on the opinions of a paper

reviewer over those of  Dr. Goldfarb which is unsupported by substantial evidence.

In March 2006, Dr. Goldfarb opined that plaintiff's ongoing symptoms were most likely

chronic in nature and were unlikely to improve with time.  Dr. Goldfarb indicated that plaintiff

was in severe pain and had significant decreased range of motion, and as a result he felt she was

essentially totally disabled at that time.  Dr. Goldfarb concluded that plaintiff would never be

19

able to return to gainful employment and would be permanently disabled secondary to her injury. (Tr. 246-48).

Dr. Goldfarb has opined that plaintiff is disabled by her impairments, particularly by the pain which results from those impairments. Dr. Goldfarb's opinion is consistent with other physician provided evidence of record. For example, treatment notes provided by pain specialist, Dr. Griffin, reveal that over time plaintiff's complaints of pain have been consistent, she had exhibited muscle tightness and tenderness, positive Neer and Hawkins signs, sharp pain with resistive muscle testing, decreased range of motion, and decreased muscle strength in the left upper extremity. *See, e.g.* Tr. 250-76, 343-83, 392-95. In addition, on August 27, 2007, Dr. Ramirez reported that plaintiff appeared to be in significant pain and he found that plaintiff had 29% whole person impairment for the allowed conditions in her workers' compensation claim. (Tr. 390-91).

In February 2007, Dr. Albert, opined that plaintiff could perform a restricted level of light exertional work. (Tr. 310-17). In accepting the RFC findings of the agency paper reviewer, and giving him great weight the ALJ fails to consider, as he is required to do, that the reviewing doctors are not specialists. Dr. Goldfarb is a orthopedic surgeon, Dr. Ramirez is a neurosurgeon, Dr. Griffin is a pain management specialist, while Dr. Albert is a family medicine/general practitioner. Clearly examining sources, with support from plaintiff's treating physician, are in a far better position to opine on the practical impact in terms of functional limitations occasioned by plaintiff's clinical symptoms and examination results. Dr. Albert bases his RFC findings on nothing more than the paper file and offers no explanation for the exertional limitations he establishes beyond a recitation of plaintiff's impairments and the conclusion that plaintiff

20

"showed good healing of her fusion and no neural compression" and "She had reached maximum medical improvement and no further recommendations." (Tr. 311). Nothing else in Dr. Albert's RFC report indicates how he reached his conclusions. Nevertheless, the ALJ establishes an RFC based on that of the non-examining, non-specializing physician.

Because the ALJ has improperly weighted and/or rejected the opinions of the examining physician, the ALJ's findings as to plaintiff s RFC are not supported by substantial evidence. Thus the hypothetical questions to the VE are also not well-founded and the testimony elicited therefrom is not reliable.

Plaintiff next argues that the ALJ erred by giving inadequate consideration to her pain and credibility. In many disability cases, the cause of the disability is not necessarily the underlying condition itself, but rather the symptoms associated with the condition. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247, (6th Cir. 2007). Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. *Rogers*, 486 F.3d at 247. First, the ALJ will ask whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. *Id.* Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities, *Id. See, Jones v. Secretary of Health and Human Services,* 945 F.2d 1365 (6th Cir. 1991), *citing, Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir. 1986).

The ALJ has determined that plaintiff has a medically determinable impairment; that is, degenerative disc disease in the cervical spine (s/p anterior cervical discectomy and fusion) and

21

thoracic spine. The question, then, is whether plaintiff's impairment has produced the disabling pain about which she complains. This Court concludes that it has produced that pain.

The record clearly establishes that plaintiff has had a long-standing back impairment dating back to January, 2003, and which has required surgery, as well as non-surgical treatment including epidural injections, physical therapy, and narcotic medication. Over time, plaintiff's complaints of pain have been consistent and her treating physicians, Drs. Greiner and Griffin, have documented her complaints and attempted to treat her pain accordingly. In addition, the objective medical tests of record, specifically the MRIs of the cervical spine, have consistently revealed abnormal findings including: the July 30, 2003 MRI revealed mild cervical disc herniation at C5-C6 and C6-C7 (Tr. 279); the September 24, 2005 MRI showed mild disc bulging at T3-4 without neural compression, relative decreased T1 signal throughout the visualized vertebral bodies, and prominent adenoid tissue with inhomogeneous signal that may be related to a thornwald cyst (Tr. 243-44); and the October 31, 2006 MRI showed evidence of ACDF at C5-C6 and C6-C7; mild discogenic changes at C6-C7 producing partial effacement of the subarachnoid space and mild left foraminal narrowing; and, decreased T1 signal throughout the vertebrae that was consistent with a cellular marrow seen with anemia or other marrow replacing entities. (Tr. 275-76).

In conclusion, the Court finds the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to properly evaluate the medical source opinions and assess plaintiff's credibility and subjective complaints of pain.

22

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner by **REVERSED** and **REMANDED** for further

proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date:   September 14, 2010

Timothy S. Hogan
United States Magistrate Judge

23

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R**

Pursuant to Fed. R. Civ. P. 72(b), within fourteen (14) days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).